CARLSON, Presiding Justice,
for the Court:
¶ 1. Jeffrey Keith Havard (Havard) was found guilty of capital murder (murder during the commission of sexual battery) of six-month-old Chloe Britt. The jury also found that Havard’s sentence should be death, and the Adams County Circuit Court imposed the death sentence upon Havard. This Court affirmed Havard’s conviction and sentence on direct appeal. Havard v. State, 928 So.2d 771 (Miss.2006). His motion for rehearing was subsequently denied, as was his motion for post-conviction relief filed May 25, 2007. Havard v. State, 988 So.2d 322 (Miss.2008). Havard is currently seeking habeas relief in the United States District Court for the Southern District of Mississippi; however, that case has been stayed pending the outcome of Havard’s second motion for post-conviction relief now before this Court. Finding no merit in Havard’s successive motion for post-conviction relief, the Court denies his successive petition.
STATEMENT OF THE FACTS
¶ 2. Havard was living in Adams County with his girlfriend, Rebecca Britt, the mother of the victim, six-month-old Chloe Britt. Havard was not Chloe’s father. Havard and Britt had been dating for a few months when Britt and Chloe moved in with Havard. On February 21, 2002, at approximately 8:00 p.m., Havard gave Britt some money and asked her to get supper from the grocery store. When Britt returned home, she found that Chloe had been bathed and was asleep. Havard told Britt he had given Chloe her bath and put her to bed. Havard had also stripped the sheets off the bed and told Britt he was washing them. Britt testified that, before that night, Havard had never bathed Chloe or changed her diaper.
¶ 3. Britt testified that she checked on Chloe and she seemed fine. Havard then insisted that Britt go back out to the video store to rent some movies. Britt further testified that when she returned, Havard was in the bathroom with the door shut. She then went to check on Chloe and found the baby was blue and no longer breathing. Britt attempted to resuscitate Chloe by CPR before Britt and Havard drove Chloe to Natchez Community Hospital, where Britt’s mother worked. The child was pronounced dead at the hospital later that night.
¶ 4. The pathologist who prepared Chloe’s autopsy report testified that some of Chloe’s injuries were consistent with penetration of the rectum with an object. Chloe’s other injuries included abrasions and bruises inside her mouth. The baby also had internal bleeding inside her skull that was consistent with shaken-baby syn *899 drome. Chloe had anal injuries that were observed by both the hospital staff and the sheriff. No one at Chloe’s day care had ever noticed bruises or marks on'Chloe. No anal injuries or anything unusual about the child’s rectum was noticed by the daycare staff earlier on the day of February 21, 2002.
¶ 5. Havard was later charged with capital murder with sexual battery being the underlying felony. Two days after Chloe’s death, Havard gave a videotaped statement, in which he denied committing sexual battery on Chloe. He claimed that he accidentally dropped her against the commode after giving her a bath, shook her in a panic, and then rubbed her down with lavender lotion before putting her to bed.
¶ 6. DNA evidence collected from the bed sheets matched the DNA of both Ha-vard and Chloe. A sexual assault kit testing for any of Havard’s DNA in Chloe’s rectum or vagina produced negative results. The only explanation offered by Havard regarding Chloe’s injuries was that he possibly wiped her down too vigorously when preparing her for bed. Ha-vard was indigent at trial and had appointed counsel at trial and on direct appeal.
ISSUES
¶ 7. We set out here the five issues as presented in Havard’s Motion for Relief From Judgment or for Leave to File Successive Petition for Post-Conviction Relief:
(1) The State violated Petitioner’s constitutional rights to a fair trial and due process of law as governed by Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and related authority;
(2) The State withheld exculpatory information in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny;
(3) Alternatively to the immediately preceding issue, Petitioner’s trial counsel were ineffective for failing to utilize the videotaped statement at issue if it was disclosed or produced prior to trial;
(4) Newly-discovered evidence demonstrates that Petitioner is innocent of the underlying felony of sexual battery-which alone made Petitioner’s case a capital murder case and Petitioner eligible for the death sentence that was imposed; and
(5) Newly discovered evidence further demonstrates that Petitioner’s trial counsel were ineffective in failing to challenge the underlying felony of sexual battery.
DISCUSSION
¶ 8. Before advancing directly to Ha-vard’s claims, we state here our standard of review when confronted with successive motions for post-conviction relief:
When this Court is presented with an application to file a motion for post-conviction relief, the Court shall deny relief unless the claims are not procedurally barred and they make a substantial showing of the denial of a state or federal right. Miss.Code Ann. § 99-39-27 (Supp.2011). Absent an applicable exception, a successive motion for post-conviction relief is procedurally barred. Miss.Code Ann. § 99-39-23(6) (Supp. 2011); Rowland v. State, 42 So.3d 503, 507 (Miss.2010).
Knox v. State, 75 So.3d 1030, 1036 (Miss.2011).
¶ 9. Additionally, filings for post-conviction relief in capital cases are to be made within one year after conviction. Miss. Code Ann. § 99-39-5(2)(b) (Rev.2007). Again, absent an applicable exception, an untimely filed motion for post-conviction relief is procedurally time-barred.
*900 ¶ 10. For the sake of discussion, we will restate and reorder the issues presented to us for consideration in today’s case.
I. WHETHER THE STATE WITHHELD EXCULPATORY INFORMATION IN VIOLATION OF BRADY v. MARYLAND AND ITS PROGENY.
¶ 11. Prior to trial, Rebecca Britt gave a videotaped statement to law enforcement officials. Havard claims that the video was uncovered during the discovery phase of his federal habeas corpus proceedings. Havard alleges that, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution withheld the videotape at trial despite his trial counsels’ request for all exculpatory evidence.
¶ 12. In Brady, the United States Supreme Court held “that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” Brady, 373 U.S. at 87, 83 S.Ct. 1194. In King v. State, 656 So.2d 1168, 1174 (Miss.1995), this Court articulated a four-part test to assess whether a Brady violation had occurred. Under the test, it is the defendant’s burden to prove: “(a) that the State possessed evidence favorable to the defendant (including impeachment evidence); (b) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (c) that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.” Manning v. State, 929 So.2d 885, 891 (Miss.2006).
¶ 13. Despite the State’s argument that Havard fails all four prongs of this test, the Court need only look to the third prong to determine that this issue must fail. In its response, the State has provided an affidavit from Gus Sermos, Havard’s lead trial counsel, in which he states that, prior to trial, he did watch the videotaped interview of Rebecca Britt that was conducted the day after Chloe’s murder at the Adams County Sheriffs Office. Sermos also states that Tom Rosenblatt, the Assistant District Attorney who prosecuted Ha-vard, along with Lt. Manley, were present at the time he watched Britt’s videotaped interview.
¶ 14. Corroborating Sermos’s affidavit is the affidavit of Tom Rosenblatt, in which Rosenblatt states that he viewed the videotaped interview of Rebecca Britt conducted by the Adams County Sheriffs office while in the presence of Gus Sermos and Lt. Manley. Given the sworn affidavits from Havard’s trial counsel and the prosecutor in his case, we find no merit in Havard’s claim of a Brady violation, because he has not shown that the evidence was suppressed.
II. WHETHER THE STATE VIOLATED HAVARD’S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW AS GOVERNED BY NA-PUE v. ILLINOIS AND RELATED AUTHORITY.
¶ 15. Havard asserts that the State solicited testimony from Rebecca Britt at trial that it knew to be false. His contention is based on Britt’s videotaped statement given the day after Chloe’s murder at the Adam’s County Sheriffs Office. Havard maintains that Britt’s videotaped statement and her trial testimony differed and that the State allowed the disparity to go uncorrected.
*901 ¶ 16. It is Havard’s contention in this successive motion for post-conviction relief that Britt’s videotaped statement is “newly-discovered evidence.” As discussed above, trial counsel was aware of Britt’s videotaped statement and viewed it prior to trial. Therefore, the videotaped statement is not newly discovered evidence. This claim would have been procedurally barred from consideration even if it had been raised in Havard’s original motion for post-conviction relief because it was capable of being raised at trial and/or on direct appeal. Miss.Code Ann. § 99-39-21(1) (Rev.2007). Likewise, because the videotaped statement is not newly discovered evidence, this issue is procedurally barred from consideration in Havard’s successive motion for post-conviction relief. Miss. Code Ann. § 99-39-27(9) (Rev.2007).
¶ 17. Assuming arguendo that Britt’s videotaped statement was newly discovered evidence not reasonably discoverable at the time of trial, it would have to be “of such nature that it would be practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence.” Id. Britt’s videotaped statement does not meet that threshold.
¶ 18. This Court has held that
“[a] new trial is required if the false testimony could have ... in any reasonable likelihood affected the judgment of the jury.” Manning v. State, 884 So.2d 717, 726 (Miss.2004) (quoting Barrientes v. Johnson, 221 F.3d 741, 756 (5th Cir.2000) (citing Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959))).
Rubenstein v. State, 941 So.2d 735, 768 (Miss.2006). To prevail on the merits, Ha-vard must first demonstrate that Britt did, in fact, give false testimony. Only then can this Court determine the reasonable likelihood that the false testimony affected the jury’s judgment.
¶ 19. Havard claims that, in her videotaped statement to law enforcement officials, Britt expressed that Havard “was actively involved in the care of Chloe Britt before the night of her death; that Mr. Havard had changed Chloe’s diapers on prior occasions; and that Mr. Havard loved Chloe.” He maintains that Britt’s videotaped statement is in “stark contrast” to Britt’s trial testimony, in which she testified as follows:
Q [By the State]: What was the relationship between Jeffrey and your baby?
A: It was — it was, I guess, your typical relationship. He didn’t spend too much time with her. I mean, other than her being at the house after day care, he didn’t really go out of his way to do things with her or things like that but—
Q: To your knowledge, did he ever bath [sic] the baby?
A: He never did except for the night in question. He said he had given her a bath.
Q: He never bathed her before that, did he?
A: No, sir.
Q: Did he ever change the baby?
A: No, sir.
Q: Did he ever have any extensive interaction, playing with her, that sort of thing, for that length of time?
A: No, sir.
Britt further testified:
Q: What was your reaction to Jeff giving the baby a bath?
A: At first, you know, I thought it was nice, you know. Trying — you know — he was trying to help me out, and then it was surprising because he hadn’t done anything like that before.
*902 Havard attempts to contrast the above trial testimony by quoting from Britt’s videotaped statement,[1] in which she stated:
Q: Becky, you know, I asked you last night. Do you know who may have done anything to your daughter?
A: Jeff is the only one I can think of. He was the only one with her.
Q: Is that — is that the only three — you can only think of Jeff, is — is that he was the only one that was with her. Is that what you’re talking about?
A: He was — he was the only one there. I can’t think of anybody else that would do that to her.
Q: Okay. Do you ever suspect that anything may have happened in the past by someone?
A: No.
Q: Is there anything else that you can tell me, Becky?
A: No. The only thing I can tell you is yesterday and the day before, she was irritable whenever he would want to hold her. And yesterday he was insistent on holding her when she was screaming, and she just screamed even more when he held her.
Q: Is there anything else that you would like to add that would help us in our investigation?
A: I don’t know.
Q: I’m sorry?
A: I know he’s got a violent temper. That’s all I know.
Q: You’re talking about Jeff?
A: Yes.
Q: How do you know he’s got a violent temper?
A: The way he argues with his grandfather, and I know he’s had simple assault on his record.
[[Image here]]
Q: How often did Jeff usually bathe the baby?
A: Never.
Q: He’s never bathed her?
A: Never.
Q: Would you say that’s kind of strange that he took it upon himself to bathe the child while you were gone?
A: Not really. I mean, he’s always doing bottles for me or cleaning up while I’m taking care of her.
Q: Did he change diapers?
A: Sometimes.
Q: Sometimes. But he never bathed her before?
A: No.
Q: Well, how did he act towards the child when he was around? Did he ever get angry with the child or anything?
A: No. He loved her. Just whenever she would be really fussy, he would just act aggravated. I mean, nothing physical or anything. He would just sigh or turn away or walk away.
¶ 20. When comparing Britt’s videotaped statement with the portion of her trial testimony Havard claims is conflicting, the only discernable disparities are her responses regarding whether Havard had ever changed Chloe’s diaper and whether she was surprised that Havard had bathed Chloe. In her videotaped statement, she told law enforcement officials that Havard sometimes had changed *903 Chloe’s diaper. Britt also responded “[n]ot really” to whether she found it strange Havard had bathed Chloe. At trial she testified that he had never changed Chloe’s diaper and that she was surprised he had bathed Chloe. In all other aspects, the statement and the testimony appear consistent.
¶ 21. Havard asserts that Britt also testified differently regarding his interactions with Chloe. At trial, Britt was asked if Havard had “extensive interaction, playing with [Chloe], that sort of thing, for that length of time” to which Britt respond that he had not. Although not entirely clear from the record, from the context of the questioning, it appears that what the prosecutor meant by "... for that length of time” was a reference to the length of time that Britt was away running errands while Havard was home alone with Chloe the night she died. Nowhere in her videotaped statement was Britt asked about the length of time Havard had spent with the baby.
¶22. All indications from her videotaped statement are, however, that Havard did not spend great lengths of time with Chloe. Britt portrayed Havard as someone who was unemployed and slept most of the day while she was out job hunting. Chloe went to daycare during the day, which was paid for by Chloe’s grandmother. In her videotaped statement, Britt told law enforcement officials that Havard was “always doing bottles for me or cleaning up while I’m taking care of her.” She also told law enforcement that Havard would sigh or turn and walk away when Chloe was “fussy.”
¶ 23. Other than Britt’s trial testimony regarding whether Havard had ever changed Chloe’s diapers and her reaction to Havard bathing Chloe, there is no disparity between Britt’s videotaped statement to law enforcement and her testimony at trial. Regardless of her reaction and assuming her trial testimony that Havard did not change diapers was false, given all the evidence in this case, there is no reasonable likelihood that it affected the judgment of the jury.
¶ 24. This issue is proeedurally barred by time and the successive-writ bar. Miss. Code Ann. §§ 99-39-5(2)(b), 99-39-27(9) (Rev.2007). Notwithstanding the procedural bars, this issue has no merit.
III. WHETHER HAVARD’S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO UTILIZE REBECCA BRITT’S VIDEOTAPED STATEMENT.
¶ 25. As an alternative to Ha-vard’s Brady violation claim discussed first supra, Havard claims that his trial counsel were ineffective by failing to utilize the videotaped statement if the State did disclose or produce it. Specifically, Havard asserts that his “trial counsel were ineffective for (a) not informing Petitioner of the existence of the statement, (b) not utilizing the statement to support [Havard]’s defense to the charge of capital murder and the underlying felony of sexual battery, and (c) not utilizing the statement to cross-examine or impeach Rebecca Britt’s trial testimony where it differed from what she told the investigators in the statement. ...”
“The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.” Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The test is two pronged: The defendant must demonstrate that his counsel’s performance was deficient, and that the deficiency *904 prejudiced the defense of the case. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064; Washington v. State, 620 So.2d 966 (Miss.1993). “This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.” Stringer v. State, 454 So.2d 468, 477 (Miss.1984), citing Strickland v. Washington, 466 U.S. at 687, 104 S.Ct. at 2065; State v. Tokman, 564 So.2d 1339, 1343 (Miss.1990).
Foster v. State, 687 So.2d 1124, 1129-30 (Miss.1996) (emphasis removed).
¶ 26. This issue is procedurally barred because it fails to meet an exception to the time bar and the successive-writ bar. Miss.Code Ann. §§ 99-39-5(2)(b), 99-39-27(9). Notwithstanding the procedural bars, Havard’s claim also fails to pass the standard set forth in Strickland.
¶ 27. Havard has failed to present any argument on this matter other than bare assertions. In his motion for post-conviction relief, Havard merely asserts that counsel were deficient and then claims that “[f]or the same reasons set forth in Claim 2, Petitioner was prejudiced by this ineffective assistance of counsel and there is a reasonable probability that, but for this ineffectiveness, the result of the proceedings would have been different.” Referring again to the affidavit of Gus Sermos, he states that, to the best of his knowledge, belief, and memory, Britt’s videotaped statement contained nothing exculpatory in nature and that Britt’s trial testimony was consistent with her videotaped statement.
[W]e must strongly presume that counsel’s conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission “might be considered sound trial strategy.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. In other words, defense counsel is presumed competent. Id. at 690, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.
Bennett v. State, 990 So.2d 155, 158 (Miss.2008). Trial counsel’s decision not to use the videotaped statement clearly falls within the realm of trial strategy. However, even if we assume, for the sake of argument, that Sermos was deficient in failing to use the statement, Havard does not explain how the statement could have been used to support his defense. Further, the only discrepancy between Britt’s videotaped statement and her trial testimony was whether Havard ever had changed Chloe’s diaper before the night Chloe died. As discussed supra, there is no reasonable likelihood that Britt’s testimony, if false, affected the judgment of the jury. Havard cannot demonstrate how he was prejudiced.
¶ 28. This issue is procedurally barred. Miss.Code Ann. §§ 99-39-5(2)(b), 99-39-27(9) (Rev.2007). Not withstanding the procedural bars, the issue also is without merit.
IV. WHETHER NEWLY DISCOVERED EVIDENCE DEMONSTRATES THAT HAVARD IS INNOCENT OF THE UNDERLYING FELONY.
¶ 29. Pursuant to a discovery order entered in Havard’s federal habeas corpus proceedings, Dr. Steven Hayne was deposed to explore his opinions regarding sexual battery in Havard’s case. Havard contends that the deposition was ordered in light of concerns that were raised in the habeas petition regarding the sufficiency of the evidence supporting the State’s allegation of sexual battery and the effective *905 ness of counsel in preparing a defense to the sexual-battery allegation. The latter of these two concerns will be discussed in Havard’s next issue. Havard also contends that the deposition was ordered so that Dr. Hayne could elaborate on his signed declaration. It is Havard’s claim that the declaration and deposition of Dr. Hayne demonstrate his innocence of the underlying felony, thus meaning that Ha-vard cannot be guilty of capital murder.

A. The Declaration of Dr. Hayne

¶ 30. In a document with the heading “Declaration of Dr. Steven T. Hayne” signed by Dr. Hayne and submitted in the federal court proceedings, Dr. Hayne stated that “[b]ased upon the autopsy evidence available regarding the death of Chloe Britt, I cannot include or exclude to a reasonable degree of medical certainty that she was sexually assaulted.” He also stated that the contusion found on Chloe’s anus “could have a variety of causes, and is not sufficient in and of itself to determine that a sexual assault occurred.” Dr. Hayne also stated that he found no tearing of Chloe’s rectum, anus, anal sphincter, or perineum.
¶31. Havard puts the most emphasis, however, on Dr. Hayne’s statement that “[djilated anal sphincters may be seen on persons who have died, as well as on a person prior to death without significant brain function. My experience as well as the medical literature recognizes that a dilated anal sphincter is not, on its own, evidence of anal sexual abuse, but must be supported by other evidence.”

B. The Deposition of Dr. Hayne

¶ 32. In his deposition, Dr. Hayne acknowledged that, prior to conducting the autopsy of Chloe, he was specifically asked to determine whether a sexual assault had occurred. There is no mention of sexual battery in the Final Report of Autopsy, because Dr. Hayne “could not come to final conclusion as to that.” Dr. Hayne stated: “There was one injury that I indicated would be consistent with the penetration of the anal area, but that, in and of itself, I didn’t feel was enough to come to a conclusion that there was a sexual assault in this particular death.” Dr. Hayne confirmed that he found no tearing of the rectum, anus, anal sphincter, or perineum and that he would have noted such tearing if it had been present. He also opined that such tearing could not have healed between the time Chloe was in the emergency room and her autopsy one day later.
¶ 33. Dr. Hayne testified about the single contusion he found on Chloe’s rectum, and the absence of abrasions and lacerations. He testified that the contusion was found in an area that is easily injured and that a rectal thermometer like that used in the emergency room to check Chloe’s temperature could cause such a contusion, but he did not think it was likely. He also stated that he could not exclude that possibility.
¶ 34. Havard asserts that his expert, Dr. James Lauridson, and Dr. Hayne both have opined that it is possible that a dilated anus can occur in a person who is dead or even a person who is clinically alive but lacks significant brain function. Dr. Hayne testified that signs of brain death include flaccidness, unconsciousness, muscle relaxation, lack of breathing, dilated and fixed pupils, lack of muscle tone, and an asystole heart. Havard points out that medical records, testimony from emergency-room treaters, and Dr. Hayne’s autopsy findings found those conditions in Chloe leading up to and following her death.
¶ 35. Some specific deposition testimony of Dr. Hayne on which Havard relies is as follows:
*906 Q: Based upon the information available to you, Dr. Hayne, was Chloe Britt brain dead or lacked significant brain function at the time her anal dilation was first noted?
A: It was.
Q: And that was after she was successfully intubated; is that correct?
A: That’s correct.
Q: And is this an opinion within a reasonable degree of medical certainty?
A: As reflected in the medical record, yes.
¶ 36. Dr. Hayne testified that a dilated anus is a recognized post-mortem finding, and an increased likelihood of such a finding is possible in children who die of brain injuries. He stated that flaccid or limp muscle condition can contribute to anal dilation. Dr. Hayne also testified that a dilated anal sphincter was not, standing alone, evidence of sexual abuse.
Q: And, Dr. Hayne, can you say from your autopsy evidence, and from the coroner’s inquest, the medical records that you reviewed, the photographs, and the laboratory findings, that this child, Miss Britt, was sexually assaulted?
A: I could not come to that final conclusion, Counselor. As I remember in trial testimony, I said that the contusion would be consistent with a sexual abuse, but I couldn’t say that there was sexual abuse, and, basically, I deferred to the clinical examination conducted at the hospital.
Q: And so from your standpoint and from your expertise, you cannot say that this child was sexually abused, to a reasonable degree of medical certainty; is that correct?
A: I could not now and I could not then, either; at the trial, or when I wrote the report, or discussed the case with the coroner.
¶ 37. The issue before this Court is whether Havard has newly discovered evidence that would exempt him from the procedural time-bar and the successive-writ bar. The new evidence must be “evidence, not reasonably discoverable at the time of trial, that is of such nature that it would be practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence.” Miss.Code Ann. § 99-39-27(9) (Rev.2007). In this task, Havard fails.
¶ 38. First, Dr. Hayne testified at Ha-vard’s trial, and he was subjected to cross-examination. In his recent deposition testimony, Dr. Hayne testified that his deposition testimony was consistent with his trial testimony. Although Dr. Hayne’s trial testimony was limited regarding sexual battery, nothing in his deposition testimony was inconsistent with his trial testimony. Additionally, at his deposition, Dr. Hayne testified that he had seen no new facts that would cause him to change his testimony at trial.
¶ 39. There is no indication that the deposition testimony provided by Dr. Hayne was undiscoverable at the time of trial. The fact that Havard’s counsel now asks questions in more detail than did Havard’s trial counsel on cross-examination does not qualify the answers as newly discovered evidence within the meaning of Mississippi Code Section 99-39-27(9).
¶ 40. Havard tries to compare his case to that of Williams v. State, 35 So.3d 480 (Miss.2010), in which the defendant was convicted on two counts of sexual battery, one against each of his two daughters. Williams challenged the sufficiency of the evidence supporting the sexual-battery charge in Count II against his younger, ten-month-old daughter. This Court reversed Count II because the only evidence against the defendant on that count was *907 the testimony of the doctor who examined the children. With regard to Count I, the older child, the doctor testified that the “injuries were ‘definitely consistent’ with someone who had been sexually abused ‘to a reasonable degree of medical certainty.’ ” Id. at 486. As to the younger daughter, the doctor’s testimony was that the child’s injuries were “very consistent with anal penetration.” Id. The Court stated: “[tjhis physician couched his opinion in terms of suspicion of probability, which, standing alone, absent additional corroborating evidence, is insufficient in a criminal case.” Id. at 486-87.
¶41. Havard relies on the following deposition testimony of Dr. Hayne:
Q: And Dr. Hayne, can you say from your autopsy evidence, and from the coroner’s inquest, the medical records that you reviewed, the photographs, and the laboratory findings, that this child, Miss Chloe Britt, was sexually assaulted?
A: I could not come to that final conclusion, Counselor. As I remember in trial testimony, I said that the contusion would be consistent with a sexual abuse, but I couldn’t say that there was sexual abuse, and, basically, I deferred to the clinical examination conducted at the hospital.
With regard to Havard’s assertion that the rectal thermometer used to take Chloe’s temperature in the emergency room could have been the object that caused the contusion, Dr. Hayne testified:
A: I did not think that was an insertion injury from a rectal thermometer by medical personnel. I could not exclude it, but I think it was unlikely, Counselor.
¶42. Havard’s case is distinguishable from Williams, most significantly because Dr. Hayne’s testimony was not the only evidence supporting the sexual-battery allegation. Unlike William s, numerous emergency-room personnel witnessed Chloe’s physical condition and gave testimony at Havard’s trial. See Havard, 988 So.2d 322, 332. Additionally, Williams denied sexually abusing his daughters. Although Havard denies that he sexually assaulted Chloe, he gave the following statement to the police:
Q: And you said you had wiped her down in her private area. Okay. Can you tell us how you wiped her down and what you done [sic],
A: I just took a normal wipe, just wiped her down between her legs like normal. Inside of her — inside of her buttocks, inside of buttocks [sic] to clean her out.
Q: And you said earlier that your finger may have slipped or you may have wiped her a little bit too hard?
A: It’s possible. I was still upset and nervous and shaky.
Q: Okay. What do you mean by wiping her too hard?
A: Maybe I was too rough with her. Maybe I shook her too hard. I don’t know.
Q: You say you wiped her too hard. What do you mean by that?
A: Maybe I went too far in on her when I was wiping her out, inside of her butt.
¶ 43. There is no merit to Havard’s claim that newly discovered evidence exists that supports his innocence. This issue is procedurally barred by time and as a successive writ. Miss.Code Ann §§ 99-39-5(2)(b), 99-39-27(9) (Rev.2007).
V. WHETHER NEWLY DISCOVERED EVIDENCE DEMONSTRATES THAT HAVARD’S TRIAL COUNSEL WERE INEFFECTIVE IN CHALLENGING THE UNDERLYING FELONY OF SEXUAL BATTERY.
¶ 44. Havard claims that the deposition testimony of Dr. Hayne, taken *908 during discovery on federal habeas review, constitutes newly discovered evidence that supports his claim of ineffective assistance of counsel. Specifically, Havard claims that this newly discovered evidence “supports [his] prior claims of ineffective assistance of counsel with respect to trial counsel’s efforts (or lack thereof) in challenging the underlying felony of sexual battery.” He contends that those claims were central to the original post-conviction challenge.
¶ 45. This claim is an attempt to rehabilitate failed claims that already have been addressed by this Court. On direct appeal, Havard claimed that his trial counsel were ineffective for failing to secure a pathologist to investigate the case and develop a defense strategy. Havard, 928 So.2d at 788. Havard’s counsel did request an independent review of the autopsy report, but the trial court denied the motion, because no basis for need was shown when Dr. Hayne was available. Id. Havard argued that it was his attorneys’ failure to present the trial court with a basis for the request that constituted ineffective assistance. Id. To support this claim, Havard relied on the affidavit of Dr. Lauridson and a medical journal article in an attempt to show the substantial need that he claimed his attorneys failed to show. Id. at 789. The Court refused to consider the documentation on direct appeal, because it was outside of the record. Id. Ultimately, the Court found that Ha-vard’s counsels’ actions were not ineffective and that the trial court did not abuse its discretion by denying Havard’s motion for an independent evaluation. Id.
¶ 46. Subsequently, in his original post-conviction-relief motion, Havard again raised the issue that his counsel were ineffective ih failing to secure an expert witness to aid in research and the development of a defense strategy. The Court reconsidered the issue, in light of Dr. Lau-ridson’s affidavit. Havard also submitted the affidavit of an attorney unrelated to Havard’s case, who opined Havard’s trial counsel were ineffective.
¶ 47. The Court considered, for the sake of argument, that even if Havard’s counsel performed deficiently, meeting the first prong under Strickland, Havard could not show prejudice. Havard, 988 So.2d at 331. Although the Court’s reasoning is more fully explained in that opinion, suffice it to state here that this Court found Dr. Lauridson’s affidavit and reports did not contain evidence that would create a reasonable probability that the outcome of Havard’s trial would have been different. Id. at 333.
¶ 48. In our discussion, we quoted Dr. Lauridson as follows:
[experienced medical examiners commonly encounter dilated anal sphincter’s [sic] during post-mortem examinations. Experience as well as the medical literature recognizes that this finding does not imply anal sexual abuse. Studies of this phenomenon, in fact have shown that children who have died of brain injuries have an increased likelihood of having a dilated anus.
Dr. Lauridson concluded his report stating, “Postmortem anal dilation in infants is a commonly recognized artifact that does not signify sexual abuse.” However, as the state points out, Chloe’s dilated anal sphincter was discovered while Chloe was in the emergency room and still alive.
Further, Dr. Lauridson’s conclusion was not only contrary to that of Dr. Hayne, it was contrary to the sworn testimony from experienced emergency-room doctors and nurses.
Id. at 332.
¶ 49. Havard pits the Court’s aforementioned statement against Dr. Hayne’s de *909 position testimony. He asserts that Dr. Hayne opined that a dilated anus is a recognized post-mortem finding and that such a finding has an increased incidence in children who have suffered a brain injury and significant loss of brain function. A review of the deposition transcript reveals that Dr. Hayne may have conceded the point to a “possibility” but that was as far as he was willing to go with his opinion.
Q: Do you commonly encounter dilated anal sphincters during a postmortem examination?
A: It can occur, but it’s not as common as I think people think.
Q: Is it a recognized finding in the postmortem period.
A: It can be, yes.
Q: And do children who have died of brain injuries have an increased likelihood of having a dilated anus postmortem?
A: It’s possible. I think you supplied me with one article from Orange Journal, '97, “American Journal of Forensic Medicine and Pathology.” In that particular article, there were 65 cases of which only a handful were involving children of less than one year of age, and of those—
[objection made by the State]
Q: Go ahead, sir.
A: And of all those, only one had suffered a traumatic death. In that particular case, the anus was described as slit-like. So in that case, there was no dilation in a violent death that Dr. Lau-ridson is referring to in his opinion of 65 cases published in the Orange Journal.
¶ 50. Havard contends that Dr. Hayne’s deposition testimony negates this Court’s previous rejection of Dr. Lauridson’s opinions concerning post-mortem anal dilation. Without conceding Havard’s argument, even if true, the Court was addressing his claim that counsel were ineffective. The Court’s statement about Chloe still being alive when the dilation of her anus was first observed was not the only basis for denying Havard’s ineffective-assistance-of-counsel claim. The Court noted and summarized the testimony of the numerous experienced emergency-room doctors and nurses describing the baby’s injuries as indicative of sexual penetration. The Court held that Havard could not show prejudice, even it were to assume, for the sake of argument, that Havard’s counsel was deficient in failing to secure an independent pathologist.
¶ 51. Havard now asserts that his attorneys were ineffective because, after failing to secure an independent pathologist, they failed to have any pretrial interaction with Dr. Hayne. He relies on Dr. Hayne’s deposition testimony that follows:
Q: Did you ever meet with Gus Sermos or Robert Clark, Mr. Havard’s attorneys about this case?
A: I don’t remember that, Counselor, but I—
[Objection made by the State]
Q: If requested by them, would you have met with the attorneys for Mr. Havard in this case?
A: I always honored those requests, either prosecution or defense.
Q: And would you have answered their questions in a meeting the same way you have today, if asked?
A: If they were asking the same questions, I would respond the same way.
¶ 52. This new line of questioning is not “newly discovered evidence” within the meaning of Mississippi Code Section 99-39-27(9). The newly discovered evidence must be “practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence.” Havard is trying to revital *910 ize his previously raised ineffective-assistance-of-counsel claim by asserting that, if he had known this new information, he would have prevailed on his original post-conviction-relief proceedings.
¶ 53. Havard now offers the deposition testimony of Dr. Hayne to show: a) that Dr. Hayne has an opinion in line with Dr. Lauridson’s and b) that Havard’s trial attorneys never interviewed Dr. Hayne prior to trial to learn of his opinion. In the original post-conviction-relief proceedings, Havard presented Dr. Lauridson’s report and documentation in an attempt to show that his trial counsel were ineffective in their failure to secure an independent pathologist. This Court considered Dr. Lau-ridson’s report and what it had to offer had it been introduced at trial. Havard’s ineffective-assistance-of-counsel claim did not pass the standard set forth in Strickland. Havard, 988 So.2d at 333. Dr. Hayne’s deposition testimony is that he does not remember meeting with Havard’s trial counsel. However, even assuming that Dr. Hayne was not interviewed by Havard’s trial counsel, the remainder of his deposition testimony that Havard seeks to have this Court consider is duplicative of Dr. Lauridson’s report, which was considered and rejected in the original post-conviction proceeding. Furthermore, Ha-vard offers no explanation as to why this information could not have been discovered prior to filing his original motion for post-conviction relief. This issue is procedurally barred. Notwithstanding the procedural bars, the issue is without merit.
CONCLUSION
¶ 54. Havard has failed to demonstrate an exception to the procedural bars. Accordingly, for the reasons discussed, Ha-vard’s Motion for Relief From Judgment or For Leave to File Successive Petition for Post-Conviction Relief is denied as time-barred and as a successive writ. Miss.Code Ann. §§ 99-39-5(2)(b), 99-39-27(9) (Rev.2007).
¶ 55. POST-CONVICTION RELIEF IS DENIED.
WALLER, C.J., DICKINSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ„ CONCUR.

. The State has provided a transcript of Britt’s videotaped statement bearing a notarized certificate from a certified transcrip-tionist, attesting to the accuracy of the transcription. Havard, on the other hand, has provided an uncertified transcription prepared by a paralegal working for Havard's PCR counsel. There are some subtle differences in the two transcriptions. For purposes of comparing Britt's videotaped statement to her trial testimony, the certified transcript provided by the State is used.