# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-DR-01256-SCT

*JOSEPH PATRICK BROWN a/k/a PEANUT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/12/1994 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR PETITIONER: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL BY: ALEXANDER KASSOFF TREASURE R. TYSON |
| ATTORNEYS FOR RESPONDENT: | OFFICE OF THE ATTORNEY GENERAL BY: ASHLEY LAUREN SULSER ALLISON HORNE BRAD ALAN SMITH |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | POST-CONVICTION RELIEF DENIED - 04/30/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.     Joseph Patrick Brown has been on death row since his conviction for capital murder in Adams County in 1994. The jury found that Brown shot and killed a convenience-store clerk during a robbery.

¶2.     Brown has now filed a successive petition for post-conviction relief in which he raises numerous issues. Most of the claims raised at this point are subject to the time bar, the successive-writ bar, and/or are barred by res judicata. The remaining issue is without merit.

The successive petition is therefore denied.

## FACTUAL BACKGROUND

¶3.     Martha Day worked as a cashier at the Charter Food Store in Natchez. She was found dead on the floor in the early morning hours of August 8, 1992. She had been shot four times. The store's cash register had been stolen.

¶4.     In the days following the murder, police were able to locate a marked $2 bill that had been in the store's cash register at the time of the crime and a .22 caliber revolver that had been sold to a bar owner shortly after the shooting. Both items were traced back to Rachel Walker. Upon questioning, Walker implicated her boyfriend, Joseph "Peanut" Brown. When he was arrested, Brown exclaimed to police that "you got me for driving the car."

¶5.     Walker, who by then had pled guilty to accessory after the fact, testified at trial that she and Brown spent the night of August 7 and 8 partying and driving around the Natchez area smoking crack cocaine. She stated that they stopped at the Charter Food Store and that Brown went inside the store. She testified that she saw Brown and Day at the store counter and that Day clutched her chest and fell to the ground. Brown then exited the store with the cash register. He placed the register and a pistol on the seat of the vehicle. He told Walker not to tell anyone what had happened. Walker testified that Brown gave her the $2 bill and the gun and told her to procure more cocaine.

¶6.     The State's firearms expert was unable to testify definitively that the bullets removed from the body at the autopsy had come from the .22 caliber revolver sold by Walker. But he

2

was able to testify that the projectiles bore class characteristics that were consistent with the gun; they were the same caliber, had the same number of lands and grooves, and had the same direction of twist.

¶7.     While incarcerated in the Adams County jail, Brown and Walker wrote each other a series of letters. Brown repeatedly told Walker not to talk to the police about the killing. Among other incriminating statements, Brown said, "All we have to do is stay with our story Baby. We don't know nothing and we was uptown from 11:30 until the next morning . . . Don't let me down . . . Do this for me Baby."

¶8.     Finally, the State called Larry Bernard who had been jailed on the same cell block with Brown. Bernard testified that Brown confessed to him that he had robbed the store and had shot Day.

## PROCEDURAL BACKGROUND

¶9.     After Brown was convicted and sentenced to death by a jury, his conviction and death sentence were affirmed on direct appeal in *Brown v. State*, 682 So. 2d 340 (Miss. 1996) (*Brown I*), *disagreed with by Portis v. State*, 245 So. 3d 457 (Miss. 2018). This Court initially granted Brown's first petition for post-conviction relief on a limited issue of ineffective assistance of trial counsel. *Brown v. State*, 749 So. 2d 82, 93 (Miss. 1999) (*Brown II*).[1] Upon remand, the trial judge found that the attorneys had not been ineffective,

---

[1] Brown was represented at trial by Donald Ogden and Pamela Ferrington. His first petition for post-conviction relief was filed by James Craig.

and this Court affirmed. *Brown v. State*, 88 So. 3d 726 (Miss. 2012) (*Brown III*). Thereafter, Brown filed motions in which he argued that he was entitled to engage in discovery in the trial court before filing a second petition for post-conviction relief. The requests for discovery were denied. *Brown v. State*, 255 So. 3d 141 (Miss. 2017) (*Brown IV*).

¶10. On July 21, 2015, Brown filed his Notice of Intent to File a Successive Petition for Post-Conviction Relief. He filed his successive petition in September of 2018.

## ANALYSIS

¶11. Brown raises numerous issues in his petition. In its response, the State argues that most of Brown's claims are procedurally barred. "Direct appeal [is] the principal means of reviewing all criminal convictions and sentences." Miss. Code Ann. § 99-39-3(2) (Rev. 2015). Review at this stage, with some exceptions, is limited to issues that could not or should not have been raised at trial and in the direct appeal. Miss. Code Ann. § 99-39-3(2); *Brown v. State*, 798 So. 2d 481, 491 (Miss. 2001). Relief is warranted if the petitioner is able to demonstrate that the claims "are not procedurally barred and . . . make a substantial showing of the denial of a state or federal right." *Grayson v. State*, 118 So. 3d 118, 125 (Miss. 2013) (quoting *Havard v. State*, 86 So. 3d 896, 899 (Miss. 2012)).

¶12. Several statutory bars apply. First, the mandate in Brown's direct appeal issued in October 1996. The successive petition was filed in September 2018. This filing is subject to the one-year time bar. Miss. Code Ann. § 99-39-5(2)(b) (Rev. 2015); *see also Jordan v.*

4

*State*, 213 So. 3d 40, 42 (Miss. 2016); *Havard v. State*, 86 So. 3d 896, 899 (Miss. 2012). The failure to raise post-conviction claims within the one-year period amounts to a waiver of potential relief unless the petitioner can meet an exception to the time bar. M.R.A.P. 22(c)(5)(i); *Jordan*, 213 So. 3d at 42 . Unless Brown can show that his claims are excepted, the petition is barred.

¶13.    Second, Brown's initial petition for post-conviction relief was ultimately denied in *Brown II* and *Brown III*.  Brown's second petition is subject to the successive-writ bar set out in Mississippi Code Section 99-39-27(9) (Rev. 2015).  Absent an applicable exception, a successive motion for post-conviction relief is procedurally barred.  *Rowland v. State,* 42 So. 3d 503, 507 (Miss. 2010).

¶14.    Some of the claims argued by Brown have been raised in prior proceedings.  As to the res judicata bar, this Court has stated that

> "Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of res judicata. The Petitioner carries the burden of demonstrating that his claim is not procedurally barred." *Howard v. State*, 945 So. 2d 326, 353 (Miss. 2006) (quoting *Jackson v. State*, 860 So. 2d 653, 660–61 (Miss. 2003); *Lockett v. State*, 614 So. 2d 888, 893 (Miss. 1992)). In *Grayson v. State*, 118 So. 3d 118 (Miss. 2013), the Court held that the petitioner's second attempt to argue that trial counsel had been ineffective in presenting in the sentencing phase "has been considered and rejected and, therefore, his claims are barred by the doctrine of res judicata." *Id.* at 141. In *Brawner v. State*, 166 So. 3d 22, 23 (Miss. 2012), the Court declined to revisit claims that previously had been addressed. The Court held that "these claims have been substantially reviewed in prior proceedings and are now procedurally barred and barred by the doctrine of *res judicata*."

*Jordan*, 213 So. 3d at 42.  Res judicata also extends to those claims that could have been

raised in prior proceedings but were not. *Ronk v. State*, 267 So. 3d 1239, 1288 (Miss. 2019); *Little v. V. & G Welding Supply, Inc.*, 704 So. 2d 1336, 1337-38 (Miss. 1997).

¶15. Brown raises fifteen issues in his successive petition:

    *I.       Prosecutors knowingly used false testimony.*

¶16. Larry Bernard testified that he had been jailed with Brown in the summer of 1993. He claimed that Brown confessed to him. According to Bernard, Brown told him that on the night of the crime, Brown had been using cocaine with Rachel Walker and others. Bernard testified that Brown said that he and Walker had driven to Charter Food Store, that he had pulled a gun on the lady in the store, and that he had shot her three or four times.

¶17. In his successive petition, Brown claims that other parts of Bernard's testimony were false, that the State knew Bernard was testifying untruthfully, and that the State knowingly put on false evidence. The United States Supreme Court has held that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). A state's knowing use of false evidence constitutes a violation of the Fourteenth Amendment. *Id.* at 269, 272; *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); *Manning v. State*, 884 So. 2d 717, 722 (Miss. 2004).

¶18. The claims raised here are subject to the procedural bars outlined above. Brown makes no attempt to argue that these issues could not have been raised in the initial post-conviction proceedings or at any other time since his direct appeal in 1996. Thus, these

claims have been waived and are barred.

¶19. As to the merits, Bernard testified that at the time of Brown's jailhouse confession, he was being held on a $10,000 bond, that his mother later posted bond for him when she found out he was in jail, and that he received no favorable treatment for his cooperation with the State. Brown now alleges that Bernard's bond was actually $50,000 and that the State got Brown's bond reduced in exchange for favorable testimony. Brown relies on documents from the Adams County Sheriff's Office that indicate that Bernard's bond had initially been set at $50,000. In response, the State has shown that Bernard's bond had been reduced to $10,000 in May of 1993 when the case had been transferred from justice court to circuit court and when Brown's case had been bound over to the grand jury. The bond reduction predated any contact between Bernard and the State about the confession.

¶20. Brown also claims that Bernard's mother was incarcerated and could not have posted bond for Bernard. Actually, the records submitted by Brown indicate that Bernard's mother was paroled around the same time that Brown's bond was posted. It appears that she would have been available to post Bernard's bond in November 1993.

¶21. Finally, Bernard's testimony about Brown's purported confession is consistent in important respects with Brown's own statement at trial. Bernard testified that Brown told him that Brown had bought cocaine on the night of the crime, that he had been smoking crack at a party behind the barber shop, and that he had been with Rachel Walker, Bear Anderson, and others into the early morning hours. Brown testified at the mitigation phase

7

of the trial. His testimony about what happened before the shooting largely mirrored Bernard's testimony about Brown's confession.

¶22. Brown has not shown that Bernard's testimony was false in any material respect. And he has not shown that the State improperly put on any false evidence. Notwithstanding the procedural bars, this claim is without merit.

II. *The State withheld evidence related to Bernard.*

¶23. Brown alleges that the State improperly withheld exculpatory information before trial. The State responds that Brown could have obtained the documents in question before the trial just as he has in these proceedings. The State maintains that Brown has offered no evidence that shows he was (a) unaware of this information or (b) did not have this information before trial.

¶24. The State had the duty to turn over all exculpatory material to the defense. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215, 218 (1963); *see also Howard v. State*, 945 So. 2d 326, 337 (Miss. 2006); *Simon v. State*, 857 So. 2d 668, 699 (Miss. 2003).

¶25. In order to establish a *Brady* violation, the defendant must show (1) that the State possessed evidence favorable to the defendant; (2) that the defendant did not possess the evidence and could not have obtained it with reasonable diligence; (3) that the prosecution

8

suppressed the favorable evidence; and (4) that if the evidence had been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. *Howell v. State,* 163 So. 3d 240, 250 (Miss. 2014) (quoting *King v. State*, 656 So. 2d 1168, 1174 (Miss. 1995)). Further, "while the government always has a duty to investigate the veracity of the information and allegations made by its witnesses, 'it is not the responsibility of the prosecutor . . . to do the work of defense counsel . . . ,' in assisting opposing counsel in impeaching a government witness." *United States v. Rovetuso*, 768 F.2d 809, 818 (7th Cir. 1985) (citation omitted).

¶26. Brown claims that the State was required to turn over Bernard's "jailhouse file" including the following material:

1. The Adams County Justice Court order setting Bernard's bond at $50,000.

2. Several Rules Violation Reports (RVRs) Bernard received while in the Adams County jail in 1993, and

3. Several 1993 letters or notes from Bernard to a sheriff's deputy and another individual.

¶27. Again, several procedural bars apply. Brown has not shown that the claims here meet any exception to the time bar or the successive-writ bar. The State also argues that

> Petitioner could have obtained the documents that collectively make up Exhibit 12 [the above-mentioned documents] to his Motion for Leave just as he has in these proceedings before his capital murder trial. Additionally, Petitioner has offered no evidence that shows he was (a) unaware of this information, or (b) did not have this information prior to trial. This claim was capable of being raised at trial, on direct appeal, and during Petitioner's initial post-conviction proceedings. Petitioner chose not to cross-examine Mr. Bernard at trial. And

9

he did not raise it on direct review. His second claim is subject to the waiver bar . . . .

The State also notes that the petitioner is unable to show that these documents were not disclosed to the defense before trial. The trial attorneys have stated that their files have since been destroyed.

¶28. As noted above, the amount of Bernard's bond had been reduced to $10,000 by circuit-court order in May 1993. The older justice-court order had been supplanted. How Brown could have benefitted from the undisclosed justice-court order is not explained. Further, both orders would have been public records available to the defense before trial. *Brady* does not obligate the State to turn over material the defense could have procured through the exercise of reasonable diligence.

¶29. The materiality of much of the remaining evidence is highly questionable. Bernard's jailhouse RVRs dealt with discipline for misidentifying his girlfriend as a family member on his visitor list and for fighting with other inmates. How that would have aided Brown's defense at trial is not discussed.

¶30. In one letter, Bernard asked for medical attention. In another, he asked law-enforcement officers to take his car away from his sisters and give it to his fiancée while he was jailed. The utility of these letters to the defense is also unexplained.

¶31. Further, some of the information in these documents could have been harmful to the defense. Bernard's letters discuss gang activity in the jail and indicate that Brown was a gang leader on the cell block.

10

¶32.    Some of the argument here relates to the timing of Brown's jailhouse discussions with Bernard.  Bernard testified that Brown confessed to him in late July or early August 1993.  It is apparent from the transcript that Bernard could not state with any certainty when the confession had happened.  The defense also knew about the time-frame issues.  The defense had interviewed Bernard before trial.  He stated then that the confession had occurred two and a half months before he informed law-enforcement officers in December.  Brown thus dates the confession to mid-September and not July or August.  The defense chose not to cross-examine Bernard about any discrepancies in the time line.

¶33.    Upon review of Bernard's jailhouse file, we find no ***Brady*** violation.  Brown has not made a showing that the evidence in Bernard's file was favorable to the defense or that it would have led to a different outcome.

> III.    *Trial counsel were ineffective for failing to prepare for Bernard's testimony*.

¶34.    Brown was represented at trial and on appeal by Donald Ogden and Pamela Ferrington.  Brown now contends that his trial-court attorneys failed to investigate Bernard's background and failed to obtain and use the supposedly favorable evidence in Bernard's jailhouse file.

¶35.    Ferrington and Ogden ceased representing Brown in approximately 1997.  And numerous claims of ineffective assistance of trial counsel were raised in the initial post-conviction-relief petition.  Those claims were ultimately rejected.  "Ineffective assistance of counsel claims in capital cases are subject to the procedural bars." ***Jordan***, 213 So. 3d at 43.

11

Brown has made no real attempt to argue that these claims are not barred.

¶36. Notwithstanding the procedural bars, the claim fails on the merits. Brown had the right to effective assistance of counsel under the United States and Mississippi Constitutions. U.S. Const. amends. VI, XIV; Miss. Const. art. 3, § 26; *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This Court recently discussed the standard for an ineffective-assistance claim:

> The benchmark for ineffective assistance of counsel is whether performance of counsel "'undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Foster v. State*, 687 So. 2d 1124, 1129 (Miss. 1996) (quoting *Strickland*, 466 U.S. at 686, 104 S. Ct. 2052). *See also* *Holly v. State*, 716 So. 2d 979, 989 (¶ 37) (Miss. 1998) ("This Court looks at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial." (citing *Carney v. State*, 525 So. 2d 776, 780 (Miss. 1988); *Read [v. State]*, 430 So. 2d [832, 839 (Miss. 1983)])). "Whether a defendant has received ineffective assistance of counsel is a question of law reviewed de novo under two prongs: '[f]irst, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense.'" *Taylor [v. State]*, 167 So. 3d [1143, 1146 (Miss. 2015)] (alteration in original) (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052).

> Under the first prong, the defendant must prove that the attorney's performance was deficient, and "[t]here is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995) (citing *Carney [v. State]*, 525 So. 2d [776, 780 (Miss. 1988)]; *Gilliard v. State*, 462 So. 2d 710, 714 (Miss. 1985)).

> The second prong is met if "the defendant ... show[s] there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hannah v. State*, 943 So. 2d 20, 24 (¶ 6) (Miss. 2006) (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052). We review evidence "in the light most favorable to the verdict and disturb the

12

verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 292 (¶ 1) (Miss. 2017).

*Ivory v. State*, 283 So. 3d 108, 117-18 (Miss. 2019). Further, a defense attorney's decision about whether to ask questions of a witness falls within the realm of trial strategy and does not generally amount to ineffective assistance of counsel. "Such choices are presumed strategic 'unless counsel's tactics are shown to be "so ill chosen that it permeates the entire trial with obvious unfairness."'" *Rogers v. State*, 85 So. 3d 293, 297 (Miss. 2012) (quoting *McGilberry v. State*, 843 So. 2d 21, 31 (Miss. 2003)).

¶37.    Ferrington and Ogden interviewed Bernard at length in March of 1994, a week before trial. Brown's defense attorneys also filed a motion to suppress Bernard's testimony. Finally, the attorneys sought and received a jury instruction on informant testimony. The jury was instructed that it "should weigh the testimony from alleged informant . . . with great care and caution, and look upon it with distrust and suspicion."

¶38.    This Court touched on this claim in the initial PCR decision. Then, Brown argued that trial counsel had been ineffective by failing to seek a continuance after they received notice that Bernard would testify about the jailhouse confession. This Court held that there had been no showing of ineffective assistance of counsel. The Court went on to state that "[t]here is no allegation that defense counsel failed to interview Bernard, only that counsel failed to cross-examine him. That decision must be attributed to trial strategy since Brown's trial attorneys were in the best position to gauge whether cross-examination of Bernard

13

would be more harmful than helpful." ***Brown II***, 749 So. 2d at 88.

¶39.   That analysis remains relevant here.  Ferrington and Ogden had met with Bernard before trial.  They knew about his criminal history.  They knew about his time-frame issues as to the date of Brown's confession, and they knew Bernard had corresponded with the jailers.  They also knew that if the door were opened during cross-examination, Bernard might testify about Brown's alleged confessions to other crimes and his gang activities.  The decision not to cross-examine Bernard was defensible trial strategy, especially when the marginal benefit of any questioning about the jailhouse record is considered.

¶40.   Brown also argues that his trial attorneys should have investigated Bernard's relationship with Natalie Paul.  Bernard and Brown's brother had both fathered children with Paul.  Brown now claims that Bernard should have been questioned about the "adversarial relationship between Bernard and Brown."  Again, the defense knew at trial about the possible friction between Brown and Bernard.  Bernard gave a statement to defense counsel before trial.  He stated that the reason Brown confided in him was that "I was the only one on the tier that he felt as though that he could trust because from my understanding his brother and my ex-girlfriend we both have a little boy and he had heard a little about me." Trial counsel knew about Paul and chose not to question Bernard about that relationship. Had Bernard been asked about bias against Brown, he likely would have testified that any hard feelings stemmed from Brown's gang's attack on him in the jail cell and not because of anything to do with the common girlfriend.  The attorney's decision was a defensible

14

strategic choice.

¶41.    Brown further argues that trial counsel should have questioned Clarence "Bear" Anderson, who was jailed with Bernard and Brown. Anderson admits that he had been questioned by the defense attorneys. As above, the decision not to call Anderson to testify at trial can be chalked up to trial strategy.

¶42.    Even if he were able to surmount the procedural bars, Brown has not shown that the trial attorneys' performance was deficient. And he has shown no prejudice.

> IV.    *Trial counsel were ineffective for failing to investigate Rachel Walker and for failing to object to inadmissible evidence and improper argument by the prosecutor.*

¶43.    Walker was Brown's girlfriend at the time of the murder. She testified that she was with Brown on the night of the crime, that Brown entered the Charter Food Store, and that he later exited with the store's cash register and a handgun. She testified that Brown gave her the marked $2 bill and the gun, both of which authorities had been able to trace back to her. Brown now claims that Ferrington and Ogden failed to properly investigate Walker's background. Specifically, Brown argues that trial counsel should have discovered that Walker allegedly confessed to the murder, had sexual relationships with Natchez police officers, had access to the gun, and had a poor reputation for truthfulness.

¶44.    As above, the State argues that claims of ineffective assistance of trial counsel were raised and rejected in the initial post-conviction relief proceedings and that the current claims are untimely and successive and barred by res judicata. We agree. Brown makes no showing

15

that these claims are not subject to the procedural bars.

¶45.    Brown also submits an affidavit from Vifran Carter who was a friend of Walker's. Carter states that Walker told her that she killed Day. Carter also claims that she and Walker used to have sex with various Natchez police officers. Brown now claims that trial counsel should have interviewed Carter before trial. Brown has not shown that his attorneys were aware of Carter or that they had any duty to interview her. Brown has failed to show that counsel were deficient in this respect.

¶46.    Walker had given several statements before trial. Brown now claims that his trial attorneys were ineffective by failing to point out various incidental discrepancies in those statements. After a review of Walker's cross-examination about her prior statements, we find no deficiency in counsel's performance.

¶47.    Brown also argues that Walker should have been cross-examined about her access to the murder weapon. The gun had been owned by Nick Green who had died shortly before Day's murder. Brown now produces several affidavits from people who insinuate that Walker could have obtained the gun at Green's home. Florence Mitchell states that "it was rumored in the community" that Walker went into Green's house several days before Day's murder. Doretha Brown now states that she was "informed by other Natchez residents" that Walker was in possession of Green's credit cards after his death. Sharon Grinnell states in her affidavit that she believes Walker "had something to do with" the death of Green. Tammy Miles states that "several people in the community said" that Walker was in Green's

home the night it burned. These affidavits are largely hearsay or are speculative. Brown has failed to show that his attorneys' performance was deficient for not interviewing these witnesses or that, had they been interviewed, the outcome of the trial would have been any different. *See Strickland*, 466 U.S. at 687.

¶48. Next, Brown claims that his trial attorneys should have investigated Walker's reputation. He submits several affidavits from Walker's acquaintances who state that Walker's reputation for truthfulness was poor. Brown admitted at trial that she had abused drugs for years and that her only means of support was shoplifting. She admitted that she had previously been convicted of assault and that she had pled guilty to accessory after the fact in Day's murder. She also admitted that she had given several pretrial statements that were not entirely consistent. Trial counsel sufficiently showed that Walker was not reputable. Calling additional witnesses to attack Walker's reputation would have been unnecessarily repetitive. The petitioner has shown no real prejudice.

¶49. Brown also argues that his attorneys should have objected to certain trial evidence. In particular, the State introduced two notes purportedly written by Walker to Brown while they were in jail. Brown now claims that his attorneys should have objected to those notes. Other letters between Brown and Walker had already been admitted. Defense counsel did in fact object to the introduction of the first note, but it was admitted over the objection. Counsel's performance was not deficient.

¶50. There was no objection to the other letter, but Brown has not shown that any objection

17

would have been fruitful. The State maintains that the letter from Walker to Brown would have been admissible because it was not hearsay under Mississippi Rule of Evidence 801(d)(2)(E), which states that statements made by a coconspirator during and in furtherance of the conspiracy are not hearsay. The State also cites *Williamson v. State*, 512 So. 2d 868, 879 (Miss. 1987), *overruled on other grounds by Hansen v. State*, 592 So. 2d 114 (Miss. 1991), in which the Court held that a statement by a coconspirator pertaining to a coverup of a completed crime is excepted from the hearsay rule and is admissible at trial.

¶51. Finally, Brown complains that the letters were not properly authenticated and that counsel should have objected. The State showed that Walker's letters were given to a jail trusty who then gave them to an Adams County jailer who would make a copy and then sign the copy before giving the original back to the trusty for delivery. The copies were placed in the case file maintained by an investigator with the sheriff's department. The letters were sufficiently authenticated, the chain of custody was sufficiently proved, and Brown has not shown that any objection would have been successful.

¶52. Finally, Brown asserts that his lawyers should have objected to certain parts of the prosecutor's closing argument. He argues that his trial counsel were ineffective because they did not object to the following statement:

> Now, [trial counsel] stayed up here for going on forty minutes and hammered the inconsistencies that we told you were going to be there in this woman's testimony, and says, "It's not reasonable to believe her; it's preposterous." Well, I'll submit to you, ladies and gentleman, you saw that girl; you didn't come in here–you did read this; you watched her testify. And I submit to you here you've got evidence; she admits that she's a crack head; she's been doing

18

dope all that night, obviously large quantities of it, and she sits in an automobile at the Charter Food Store and watches the man she loves blow a lady away in front of her, and he tells me that her actions are unreasonable. Says it's not reasonable for her to be scared of him. Well, I'd submit to you that I'd be scared of him if he was standing right beside me, in another room in the house, or halfway across the 200 block of Martin Luther King Street. And it's certainly nothing unreasonable about that.

The State maintains that the argument was in response to the defense attorney's closing statement in which he claimed that Walker's testimony was preposterous and that believing that Walker was afraid of Brown was unreasonable. "[The prosecutor] is granted wide latitude during closing argument. '[T]he court cannot control the substance and phraseology of counsel's argument; there is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence.'" *Grayson*, 118 So. 3d at 139 (second alteration in original) (quoting *Manning v. State*, 735 So. 2d 323, 345 (Miss. 1999)). The prosecutor may respond to the defense's closing arguments. *Moffett v. State*, 156 So. 3d 835, 868 (Miss. 2014).

¶53. The prosecutor also stated in closing that

> I have handled literally hundreds of cases, and I have never since I've been there seen a case wherein the evidence is more overwhelming than it is in this one. Never. And I'm not talking about just in volume. I'm talking about in evidence, in actual quality of evidence.

Brown claims that this was an improper personal opinion. It would have been preferable if the prosecutor had drawn inferences without stating his personal opinion. But considering the closing argument in its entirety, there is no error. *See Evans v. State*, 725 So. 2d 613, 671 (Miss. 1997) ("[I]t is clear that the prosecutor was making introductory remarks prior to

19

reviewing the testimony of the witnesses at trial and arguing inferences and conclusions from that testimony. The prosecutor made it clear that the conclusions he was making could be drawn from the evidence.")

¶54. Finally, Brown claims that trial counsel should have objected to the prosecutor's argument in which he asked the jury "to render justice in this case to the victim, to the victim's family and to society by holding this defendant accountable for what he has done." Brown now claims that that comment was an improper victim-impact statement. "Victim impact statements are those which describe the victim's personal characteristics, the emotional effect of the crimes on the victim's family, and the family's opinions of the crimes and the defendant." ***Wells v. State***, 698 So. 2d 497, 512 (Miss. 1997). The prosecutor here did not improperly comment on the victim or the victim's family. Any objection would have been fruitless.

      V.    *Prosecutors failed to disclose that Walker had been involved sexually with police officers.*

¶55. Brown alleges that Rachel Walker had been involved in sexual relations with various Natchez police officers. He offers several affidavits to that effect. He maintains that the information about Walker's past "is material because it weakens the credibility of the NPD officers, Ms. Walker, and NPD's investigation of Mr. Brown's case."

¶56. Brown argues that the State had a duty to disclose that information to the defense but did not. According to ***Brady***, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or

20

to punishment, irrespective of the good faith or bad faith of the prosecution." ***Brady***, 373 U.S. at 87; *see also* ***Lofton v. State***, 248 So. 3d 798, 810 (Miss. 2018).

¶57. This issue has peripherally been addressed above with the claim that trial counsel failed to thoroughly investigate Walker's background. Again, numerous allegations of ineffectiveness of trial counsel were raised in the original petition for post-conviction relief in the 1990s. As with the ineffective-assistance-of-trial-counsel claims, at this point, the ***Brady*** claim is subject to the time bar, the successive-writ bar, and res judicata. This issue could and should have been raised in prior proceedings.

¶58. On the merits, Brown has still not shown that he is entitled to relief. In reviewing ***Brady*** claims, this Court applies a four-part test. That test requires a petitioner to prove

> (a) that the State possessed evidence favorable to the defendant (including impeachment evidence); (b) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (c) that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

***Havard***, 86 So. 3d at 900 (internal quotation marks omitted) (quoting ***Manning***, 929 So. 2d at 891).

¶59. Much of the testimony in the affidavits is hearsay or rumor. Florence Mitchell states via affidavit that "I had heard a lot of rumors about Rachel having affairs with many members of the Natchez Police Department . . . ." Doretha Brown now swears that "it was the understanding of many Natchez residents at the time that Rachel Walker had a sexual relationship with Lt. William Mitchell and other Natchez police officers . . . ." This

21

testimony would not have been admissible. Brown has not shown by a reasonable probability that the outcome of his trial would have been any different.

> VI. *The investigation and prosecution were plagued with numerous incidents of misconduct.*

¶60. Any prosecutorial misconduct claims could have been raised at trial, in the direct appeal, or in the initial post-conviction filings. The petitioner makes no argument that these claims are excepted from the procedural bars. These claims have been waived.

¶61. Brown first claims that the prosecutor improperly asked Walker about a portion of a pretrial statement she had given. Several days after the murder, Walker had been questioned by police. At that point, she stated that after the shooting and after Brown had given her some money from the store's cash register, Brown "went and stole some dope." After the defense questioned Walker during cross-examination about inconsistencies in her pretrial statements, the prosecutor on redirect questioned Walker about that portion of the statement in which Walker had said that Brown stole the dope. Brown claims that this was prosecutorial misconduct. In response, the State maintains that it "did not commit prosecutorial misconduct by questioning Ms. Walker about false information; it merely read *verbatim* a portion of Ms. Walker's August 11th statement in response to a line of questions the defense asked on cross-examination." "Where the defense attorney inquires into a subject on cross-examination of the State's witness, the prosecutor on rebuttal is unquestionably entitled to elaborate on the matter." ***Robinson v. State***, 247 So. 3d 1212, 1230 (Miss. 2018) (internal quotation marks omitted) (quoting ***Crenshaw v. State***, 520 So. 2d 131,

22

133 (Miss. 1988)). There was no prosecutorial misconduct here.

¶62. Next, Brown claims that the prosecutors were guilty of misconduct for introducing into evidence a note purportedly written by Walker to Brown. This note was discussed under Issue IV above. In that note, Walker offered to "take the rap" for Brown so he would not have to "go to the pen for so long." Brown now claims that the handwriting on the note was different than the writing in other notes from Walker and that the State should have known that Walker likely did not write the letter. The admissibility of the jailhouse letters was addressed in the direct appeal. There, this Court found that "[t]he letters were carefully reviewed by the trial court for their content and nature of origin. Therefore, the trial court did not err in admitting the letters at trial and this assignment of error is without merit." ***Brown I***, 682 So. 2d at 352.

¶63. Brown also argues that portions of the prosecutors' closing argument were improper. These claims have been discussed above under the claim of ineffective assistance of counsel for failing to object to the closing argument. The prosecutor made the following statement during summation:

> I'd submit to you that I'd be scared of [Mr. Brown] if he was standing right beside me, in another room in the house, or halfway across the 200 block of Martin Luther King Street. And it's certainly nothing unreasonable about that.

This argument was in response to the defense attorney's argument that Walker's actions after the shooting had been unreasonable. The prosecutor responded that Walker had acted reasonably, given that she had witnessed the murder and understandably would have been

23

afraid of Brown.

¶64.    Finally, Brown maintains that the prosecutor improperly commented on the impact the crime had on the victim and the victim's family.  No objections were posed by defense counsel.  Ordinarily, "the failure to object contemporaneously generally waives a claim of prosecutorial misconduct during closing argument, [but] we will review such a claim if the prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion."  *Ambrose v. State*, 254 So. 3d 77, 129-30 (Miss. 2018) (internal quotation mark omitted) (quoting *O'Connor v. State*, 120 So. 3d 390, 399 (Miss. 2013)).  "Attorneys generally are afforded wide latitude in arguing their cases to the jury." *Ronk v. State*, 172 So. 3d 1112, 1137 (Miss. 2015) (citing *Sheppard v. State*, 777 So. 2d 659, 661 (Miss. 2001)). "[A]ny allegedly improper prosecutorial comment must be considered in context, considering the circumstances of the case, when deciding on their propriety." *Id.* (alteration in original) (internal quotation mark omitted) (citing *Smith v. State*, 729 So. 2d 1191, 1215 (Miss. 1998)). Brown has failed to show that the prosecutor's statements here were so inflammatory as to require relief at this point.

¶65.    Brown also claims that an investigator coerced a statement from a defense witness. Clarence "Bear" Anderson was listed as an alibi witness for Brown.  Initially, the defense expected him to testify that Brown had been partying with him, Walker, and others behind the barber shop in the 200 block of Martin Luther King Drive all night.  But Anderson previously gave a statement to investigators in which he stated that Brown and Walker had

24

left the party at one point. Counsel for Brown interviewed Anderson again after becoming aware of his statement to police. Anderson told them that he had left out the part about Brown's leaving with Walker. The defense thus chose not to call Anderson at trial.

¶66. Brown now claims that Anderson's statement was coerced by police. Anderson has submitted an affidavit in which he claims that "I was afraid that if I didn't do what Eddie Walker [the investigator] wanted, he would put a criminal charge on me." There is no other claim of coercion. Brown cites no relevant authority. Brown has not made a showing that the statement was coerced in any way.

¶67. Notably, in his new affidavit, Anderson never says that Brown did not leave the party. He just claims that Brown did not leave in a car. Further, Anderson swears that he would have been willing to testify to any of this at Brown's trial. None of this can be considered new evidence. This was all available to the defense at the time of trial.

¶68. Brown next argues that Walker was untrustworthy, that investigators prematurely focused on Brown as the suspected shooter, and that the investigation was tainted with bias and errors and/or intentional fabrication of evidence. These are essentially jury arguments. Generally, "the sufficiency or insufficiency of a police investigation goes to the weight of the evidence, and it is for a jury to decide what evidence to believe." *Cox v. State*, 849 So. 2d 1257, 1267 (Miss. 2003). The jury heard Walker's testimony that Brown killed Day and then gave her the gun and the marked bill. The jury saw the incriminatory notes Brown wrote to Walker. And the jury heard testimony about Brown's jailhouse confession. The time to

25

question the investigation was at trial.

¶69.    Brown claims that law enforcement improperly lost or failed to maintain a statement from "two white ladies" who had been at the Charter Food Store shortly before the murder. The claim that the ladies had any exculpatory information beneficial to Brown is entirely speculative. The lost statement was the subject of a pretrial hearing. The officer testified at the hearing that the ladies had nothing meaningful to add to the investigation other than that they had seen a white vehicle at the store. Officers had investigated the white vehicle and had found that it had nothing to do with Day's killing. Brown has not shown that the lost statement was exculpatory or could have been helpful to the defense in any way.

VII.    *The trial court erred by allowing a note from Walker into evidence.*

¶70.    Brown again challenges the admission of a letter written by Walker to Brown while both were detained in the Adams County jail. Under Issue IV above, Brown argued that his trial attorneys were ineffective for failing to object to the letter. Under Issue VI above, Brown argued that prosecutors were guilty of misconduct regarding the same letter. No matter how the claim is framed at this stage, this issue is barred.

¶71.    Now, Brown asserts that the trial judge erred by admitting unauthenticated hearsay into evidence. This claim is subject to the time bar and the successive-writ bar. The trial was held in 1994. Many of the trial judge's evidentiary decisions were raised in the direct appeal. There is no reason this claim could not have been raised at that stage. The secondary ineffectiveness claim could have been raised in the initial petition for post-conviction relief.

26

¶72. Additionally, this issue was substantially covered in the direct appeal. As noted above, this Court found that "[t]he letters were carefully reviewed by the trial court for their content and nature of origin. Therefore, the trial court did not err in admitting the letters at trial and this assignment of error is without merit." *Brown I*, 682 So. 2d at 352.

¶73. The State submitted a letter purportedly written by Walker to Brown. She offered to "take the rap" for Brown. The State contends that the letter is not hearsay. Mississippi Rule of Evidence 801(d)(2)(E) provides that a "statement [that] is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy" is not hearsay. The State argues that Walker and Brown were coconspirators after the fact (Walker pled guilty to accessory after the fact) and that the statements pertained to attempts to conceal evidence and to help Brown avoid conviction. As to authentication, the State offered evidence that Walker gave the letter to a jail trusty who submitted it to the jailer who transferred it to the investigator. Walker admitted that the handwriting could have been hers. Further, there is nothing in this particular letter more incriminating than Brown's own letters that he wrote to Walker. Those letters were admitted into evidence and included multiple pleas from Brown not to talk to the police, to stick to their story, to tell them she did not know anything, and not to let him down. Walker's letters to Brown were more or less consistent with Brown's letters to Walker, all of which were admitted into evidence.

¶74. This Court reviews a trial judge's evidentiary decisions for abuse of discretion. *Bowman v. State*, 283 So. 3d 154, 164 (Miss. 2019) (citing *Hargett v. State*, 62 So. 3d 950,

952 (Miss. 2011)).  Brown has shown no abuse of discretion.

> VIII.  *The trial court erred by allowing the pathologist to testify that the victim had been shot twice in the back while she was lying on the ground.*

¶75.  Any claim as to an evidentiary decision made by the trial judge should have been raised at trial and on direct appeal.  This claim is subject to the procedural bars and has been waived.

¶76.  Dr. David Steckler performed the autopsy.  He testified that Day suffered four gunshot wounds—one to the forehead, one to the chest, and two to the back.  As to the two shots to the back, Dr. Steckler testified that he had probed the bullet paths and that the projectiles had traveled "from a lower to a [sic] upper position or path."  Over objection, the pathologist testified that in his opinion, "the body was probably on the floor or lying down or in some prone position."  According to Dr. Steckler, his opinion was based on "the angle of the projectile . . . or otherwise the body or the person would have to be above the point of firing range."

¶77.  The defense objected on the basis that there were too many variables for the pathologist to be able to discern the position of the body in relation to the gun.  The trial judge allowed the testimony.

¶78.  Brown now claims that the opinion that Day was on the ground when she was shot in the back should have been excluded because the State had not included that portion of the expert's opinion in discovery disclosures.  The autopsy report was given to the defense

before trial. In the report, Dr. Steckler discussed the paths of the bullets at some length and noted that the shots to the victim's back angled upward. The State argues that the expert's testimony was reasonably foreseeable from information provided in the report and, thus, that there was no discovery violation.

¶79.   Generally, in situations in which the State has failed to produce material in discovery, trial judges are to follow the procedure set out in *Box v. State*, 437 So. 2d 19 (Miss. 1983) (Robertson, J., specially concurring). Rule 17.9(b) of the Mississippi Rules of Criminal Procedure further reflects the *Box* procedure. The procedure, which is equally applicable in capital cases, provides,

> When faced with previously undisclosed evidence to which the defendant has objected, the trial court should give the defendant a reasonable opportunity to familiarize himself with the evidence. If the defendant thereafter believes he may be prejudiced by admission of the evidence because of his lack of opportunity to prepare to meet it, he must request a continuance. Should the defendant fail to request a continuance, he has waived the issue. If he indeed requests a continuance, the state may opt to proceed without the undisclosed evidence, else the trial court must grant the continuance. Failure to follow the *Box* guidelines is prejudicial error, requiring reversal and remand.

*Blakeney v. State*, 236 So. 3d 11, 22 (Miss. 2017) (quoting *McCullough v. State*, 750 So. 2d 1212, 1217 (Miss. 1999)).

¶80.   Here, Brown never made any objection on the basis of the State's failure to disclose the expert's opinion or unfair surprise. And the defense never requested a continuance. In addition to the bars mentioned above, this claim has been waived under the *Box* guidelines even if the expert's conclusions as to the position of the body should have been disclosed.

¶81. Further, the opinion likely would have been admissible anyway. In *Bell v. State*, 725 So. 2d 836, 853 (Miss. 1998), this Court held that a trial judge's decision to allow an expert pathologist to testify about the position of the body of the shooting victim was consistent with the Rules of Evidence. The Court held that the pathologist's expertise in forensics was sufficient to allow him to testify about how wounds are received. *Id.* The Court further stated that the expert's "expertise necessarily relates to the position of the body at the time." *Id.* at 853. Further, in *Jordan v. State*, 786 So. 2d 987, 1017 (Miss. 2001), the pathologist testified that the victim was likely kneeling in a stationary position when the shot was fired. This Court found no error there. *Id.*

¶82. Brown also claims that he was not given the opportunity to rebut Dr. Steckler's opinions with an expert of his own. He presents an affidavit from an expert who now states that it is possible Day was lying down when she was shot in the back but that her body position cannot be determined with any accuracy. At trial Brown never attempted to rebut the pathologist's opinion by calling his own expert.

¶83. Finally, this testimony was likely harmless anyway. Brown's defense was that Walker or someone else shot Day. There was no claim that the shooting was accidental or that the gun was fired in self-defense, so the relative positions of the shooter and the victim would not have been particularly relevant. Brown has not shown that post-conviction relief is warranted.

> IX. *Brown's rights were violated when he was briefly represented by the same attorney who represented Bernard.*

¶84. The events at issue here happened in 1993. Any claim as to an attorney's conflict of interest could have been raised before the trial judge, in the direct appeal, or in the first post-conviction petition. This issue is waived.

¶85. Larry Bernard had been charged with rape. Attorney Leonard Rosenthal was appointed to represent Bernard in September 1993. Ogden was appointed to represent Brown in August 1993. Rosenthal was added to Brown's defense team in November 1993 but was replaced by Ferrington in December. Bernard gave a statement to authorities about Brown's jailhouse confession during this time period. Brown now argues that Rosenthal was conflicted in representing both Brown and Bernard and that Brown was prejudiced.

¶86. Under the Sixth Amendment, a criminal defendant has the right to be represented by counsel whose loyalties are undivided. *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981). In order to establish a Sixth Amendment violation based on a attorney's conflict of interest, the defendant must show (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); *see also Crawford v. State*, 192 So. 3d 905, 918 (Miss. 2015).

¶87. The State argues that Rosenthal never actively represented Brown during his appointment. We agree. Brown points to nothing in the record that Rosenthal filed any pleading or attended any court proceeding on behalf of Brown. While Rosenthal submitted a bill for his representation of Bernard, as far as can be determined from records submitted

by Brown, Rosenthal never billed the county for any representation of Brown.

¶88.    Further, Brown has failed to show that counsel's performance was in any way affected by the conflict. And finally, Brown was also represented by an unconflicted attorney during the brief period of Rosenthal's appointment.

> X.    *The State struck African-American prospective jurors who had criminal backgrounds or a family member with a criminal history while accepting a white juror with two DUIs.*

¶89.    The substantive claim that the State committed a ***Batson***[2] violation is subject to the procedural bars. The time for raising this issue has long since passed, and this claim could and should have been raised in prior proceedings. Further, Brown's ***Batson*** claims were discussed extensively in ***Brown II***. Res judicata applies. ***Batson*** claims are subject to the procedural bars. *See **Bell v. State***, 66 So. 3d 90, 92 (Miss. 2011).

¶90.    In his initial post-conviction petition, Brown argued that trial counsel had been ineffective for failing to rebut the State's race-neutral reasons for striking six African-American jurors. In reviewing the ineffective-assistance claim, this Court concluded that,

> In the present case, trial counsel did raise the objection, but the State successfully supported its use of the peremptory jury strikes. *A review of the record shows that the State gave legitimate race-neutral reasons for each of the six challenges*. As for the prosecution's reliance on information supplied by the police, this Court has previously held
>
> > We decline to set any limits on the prosecutor's use of any legitimate informational source heretofore or hereafter available as to jurors. Furthermore, the prosecutor does not have to

---

[2] ***Batson v. Kentucky***, 476 U.S. 79, 93, 106 S. Ct. 1712, 1721, 90 L. Ed. 2d 69 (1986).

> question a juror in open court about such information before using it as a racially neutral ground to make a peremptory strike, as long as the source of the information and the practice itself are not racially discriminatory.

> *Lockett v. State*, 517 So. 2d 1346, 1352 (Miss. 1987). The State's reliance on police information was not improper, and trial counsel cannot be faulted for failing to further contest a race-neutral explanation for a peremptory strike. Further, Brown makes no showing that the outcome of his trial would have been different had his *Batson* objections been sustained. This issue is without merit.

*Brown II*, 749 So. 2d at 88 (emphasis added).

¶91. During the jury-selection process, the State exercised four of its peremptory challenges against African-American jurors. The State struck five white jurors. The State accepted three black jurors, one of whom was ultimately struck by the defense. The defense also struck eleven white jurors.

¶92. Brown asserts that, before jury selection, the prosecutors had discussed members of the jury pool with law-enforcement authorities and had learned about the criminal backgrounds of some jurors or their family members. These convictions or brushes with the law formed part or all of the race-neutral reasons for striking four African-American jurors. At trial, the defense made no attempt at rebutting the State's race-neutral reasons for striking those jurors.

¶93. Brown does not contest the factual background that provided the bases for the State's strikes. Instead, Brown argues that Sanford Ray, a white member of the jury, had been convicted of two DUIs but was not struck by the State. Brown maintains that the State's

reasons for striking African-American jurors were pretextual or were not evenly applied. "[D]isparate treatment of similarly situated jurors is an indicator of pretext for racial discrimination." *Flowers v. State*, 947 So. 2d 910, 921 (Miss. 2007).

¶94. Brown argues that his *Batson* claim is not barred and cites the United States Supreme Court's decision in *Foster v. Chatman*, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016). There, in a state habeas proceedings, the petitioner had been able to obtain the prosecutor's trial file and had discovered notations that showed racial motivations for excusing black jurors. *Id.* at 1740. The Georgia court found that the new evidence precluded application of the res judicata bar but found no *Batson* violation. *Id.* The Supreme Court held that there was a jurisdictional federal question (*Batson*), and that this newly discovered evidence sufficiently showed that the prosecution's strikes were motivated by improper discriminatory intent. *Id.* at 1742.

¶95. The question then is whether Ray's DUI convictions could be newly discovered evidence, which would allow Brown to surmount the procedural bars. For purposes of the post-conviction relief statutes, "newly discovered evidence" is "evidence, not reasonably discoverable at the time of trial, which is of such nature that it would be practically conclusive that had such been introduced at trial it would have caused a different result in the conviction or sentence." Miss. Code Ann. § 99-39-5(2)(a)(i) (Rev. 2015); *see also* Miss. Code Ann. § 99-39-23(6) (Rev. 2015). Brown must show that (1) the new evidence was discovered after the trial; (2) it could not by due diligence have been discovered before trial;

34

(3) it is material to the issue and not merely cumulative or impeaching; and (4) it would probably produce a different result or verdict in the new trial. *Crawford v. State*, 867 So. 2d 196, 203-04 (Miss. 2003).

¶96.   At this stage, Brown relies on the transcript from Ray's guilty plea to felony DUI in 1996. Brown's trial was in 1994. Ray admitted during his plea that he had been convicted of two DUIs in Amite County in 1991. Ray's DUI convictions would have been public record at the time of trial. And his felony conviction, which was based on the 1991 DUIs, was public record when Craig filed Brown's first PCR in 1998. No issue regarding Ray's history was raised until now. Brown has made no attempt to show that the public records from the 1990s were not discoverable by reasonable diligence before now. This is not proper newly discovered evidence.

¶97.   The factual background between this case and *Foster* is also distinguishable. In *Foster*, the Georgia prosecutors struck all four of the black jurors who qualified. *Foster*, 136 S. Ct. at 1740. Two African-Americans served on Brown's jury. Another would have served had she not been struck by the State. And the State did not use three of its peremptory strikes.

¶98.   In arguing that the State's investigation of jurors was discriminatory or that its race-neutral reasons were pretextual, Brown primarily relies on a comparison of the State's treatment of potential juror John Cotton, who is African-American, with that of Ray. The State struck Cotton but accepted Ray. The State's purportedly race-neutral reason for

35

striking Cotton was twofold: that Cotton had had alcohol violations in Gloster and in Woodville and had failed to pay the resulting fines.

¶99.   "It is well established that a ***Batson*** violation may be shown by disparate treatment of white and minority jurors—that is, if a 'side-by-side comparison[] of some black [potential jurors] who were struck and white ones who were not' shows that the only material distinction between the removed black and the retained white individuals is their race."

***United States v. Atkins***, 843 F.3d 625, 631 (6th Cir. 2016) (alteration in original) (quoting ***United States v. Torres-Ramos***, 536 F.3d 542, 559 (6th Cir. 2008)). And "the 'burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.'" ***Batson***, 476 U.S. at 93 (quoting ***Whitus v. Georgia***, 385 U.S. 545, 550, 87 S. Ct. 643, 17 L. Ed. 2d 599 (1967)).

¶100.   In conducting a disparate-treatment comparison, the jurors need not be similarly situated in all respects. ***Atkins***, 843 F.3d at 631. But "[a] side-by-side comparison of jurors is helpful to determine whether purposeful discrimination existed." ***Flowers v. State***, 240 So. 3d 1082, 1161 (Miss. 2017) (citing ***Flowers v. State***, 947 So. 2d 910, 921 (Miss. 2007)), *rev'd and remanded*, 139 S. Ct. 2228, 204 L. Ed. 2d 638 (2019).

¶101.   The side-by-side comparison between jurors Cotton and Ray shows that their situations were not identical. According to Brown's submissions at this stage, Ray had two DUI convictions. According to the State's race-neutral reasons at trial, Cotton had multiple alcohol violations in two jurisdictions plus a failure to pay the fines. There is no indication that Ray failed to pay his fines.

¶102. Finally, it should be noted that much of the premise here is speculation on Brown's part. We do not know what the State's investigation of Ray or other white jurors entailed or what it revealed. It is entirely possible that the law-enforcement officers questioned by prosecutors were familiar with Cotton but did not remember Ray. It is possible that Cotton's infractions were more recent than Ray's three-year old convictions. Nothing in the record indicates that the State knew that Ray had the DUIs yet accepted him anyway. The trial judge found no purposeful discrimination in the use of the State's strikes. The standard is highly deferential. *See **Hartfield v. State***, 161 So. 3d 125, 138 (Miss. 2015) ("Because a **Batson** ruling is largely based on credibility, we give great deference to the trial court's decision." (citing **Batiste v. State**, 121 So. 3d 808, 848 (Miss. 2013))).

> XI.     *The jury's result was based in part on erroneous and extraneous information.*

¶103. As above, this claim is subject to the procedural bars. Brown makes no showing that this issue is excepted from the bars. Brown makes no attempt at arguing that this claim could not have been brought well before now.

¶104. Brown submits affidavits from two women who served on his 1994 jury. He claims that they were influenced by improper information. Juror Sharon Shelton now states that, "[d]uring sentencing deliberation, a couple of people held out for life without parole. We had a discussion, and someone said that we had to be unanimous." Juror Margie Whittington now states that two holdouts were convinced to vote for the death penalty "because if we sentenced Brown to life, he would not be able to appeal. If we sentenced him to death he

37

would be able to appeal." Whittington also states that the State's strongest evidence against Brown was that his fingerprints were found on the cash register. In actuality, no prints were recovered from the cash register. According to the affiants, there was also some confusion about Brown's right to appeal if the jury returned a life sentence as opposed to death.

¶105. The State argues that the submission of the affidavits is improper. Mississippi Rule of Evidence 606(b) provides that

> **(1)** ***Prohibited Testimony or Other Evidence.*** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
>
> **(2)** ***Exceptions.*** A juror may testify about whether:
>
> **(A)** extraneous prejudicial information was improperly brought to the jury's attention; or
>
> **(B)** an outside influence was improperly brought to bear on any juror.

¶106. Generally, a juror is not allowed to attack her own verdict. ***Puckett v. State***, 879 So. 2d 920, 930 (Miss. 2004) ("Moreover, jurors generally may not impeach their own verdict by testifying about motives or influences affecting deliberations." (internal quotation marks omitted) (quoting ***Lewis v. State***, 725 So. 2d 183, 190-91 (Miss. 1998))); *see also* ***Gladney v. Clarksdale Beverage Co., Inc.***, 625 So. 2d 407, 419 (Miss. 1993) ("[I]n the interests of protecting the jury system, and the citizens who make it work, rule 606 should not permit any inquiry into the internal deliberations of the jurors." (internal quotation marks omitted)

38

(quoting *Tanner v. United States*, 483 U.S. 107, 125, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987))). The Advisory Committee Note to Rule 606 provides that "testimony or affidavits of jurors is incompetent to show a compromise verdict, a quotient verdict, misinterpretation of instructions, and the like." Finally, what jurors discussed with other jurors during deliberations is not "extraneous information." There is no allegation here that any improper information came from "outside the jury room." *Payton v. State*, 897 So. 2d 921, 954 (Miss. 2003).

¶107. As to any confusion about the unanimity of the verdict, the defense attorneys argued in closing at the sentencing phase that "if you cannot agree as to punishment, then you say that; you write it on a piece of paper, "We cannot agree as to punishment." And then the Judge will impose a sentence of life."

¶108. Further, the jury was repeatedly instructed that the sentencing verdict did not have to be unanimous. Instruction D-22 read that,

> if you are unable to unanimously agree which circumstances outweigh the other and arrive at a verdict fixing the punishment, then the form of the verdict should be as follows: "We, the jury, are unable to unanimously agree upon the punishment to be inflicted."

¶109. Instruction D-24 provided that

> Each individual juror must decide for himself whether death or life in prison is the appropriate punishment for JOSEPH PATRICK BROWN. Only if each and every juror finds beyond a reasonable doubt that death is the only appropriate punishment may you impose the sentence of death.

¶110. In Instruction D-26, the jury was told that

39

you are not required to unanimously find that a mitigating circumstance exists before considering it. Each individual juror is required to consider all mitigating circumstances that he or she may find, regardless of whether the other jurors may agree or disagree that the factor is present. In considering the mitigating circumstances, each of you must decide for yourself what weight and consideration is to be given to mitigating circumstances. In other words, even if all eleven other jurors believe that a mitigating circumstance does not exist, or should be given no weight, if one individual juror believes that the circumstance does exist, or that it should be given more weight than it is given by other jurors, that individual juror should follow the dictates of his or her personal opinion.

"[I]t is presumed the jurors follow the instructions of the court." *Moffett v. State*, 49 So. 3d 1073, 1108 (Miss. 2010) (internal quotation mark omitted) (quoting *Williams v. State*, 684 So. 2d 1179, 1209 (Miss. 1996)). Brown's jury was repeatedly told that its sentencing verdict did not have to be unanimous.

¶111. As to the juror's statement about the cash register, it seems more likely that the juror has simply misremembered the evidence at trial. As with any confusion at this point about the unanimity of the verdict, this is understandable. The trial was twenty-five years ago.

¶112. Brown submits no proof of any improper external influence upon the jury in 1994. It is more likely that these errors are attributable to faulty memories a quarter century after the trial. Brown has not shown that the jury relied on any extraneous or outside-the-courtroom information.

> XII. *The trial attorneys failed to investigate and present adequate mitigating evidence.*

¶113. This claim could have been raised before now and was in fact substantially brought in the first post-conviction proceedings. There, in addition to multiple other claims of

40

ineffective assistance of trial counsel, Brown argued that his trial attorneys had been ineffective by failing to call his mother at the sentencing phase and by failing to seek an expert mitigation witness who would testify about Brown's psychological state. This Court initially granted relief on the expert-witness question. *Brown II*, 749 So. 2d at 91. Then, on appeal after a hearing, this Court agreed with the trial judge that Brown had not shown that his trial attorneys were ineffective in their presentation of the mitigation case. *Brown III*, 88 So. 3d at 733. This claim has been litigated and is barred by res judicata.

¶114. As noted in Brown's prior appeals, "[t]he decision to call a witness is generally considered a matter of trial strategy." *Brown II*, 749 So. 2d at 91 (citing *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985)). And "[c]laims that additional witnesses should have been called are disfavored." *Turner v. State*, 953 So. 2d 1063, 1074 (Miss. 2007). Additionally, the petitioner can show "no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker . . . ." *Chamberlin v. State*, 55 So. 3d 1046, 1054 (Miss. 2010) (internal quotation mark omitted) (quoting *Sears v. Upton*, 561 U.S. 945, 955, 130 S. Ct. 3259, 3266, 177 L. Ed. 2d 1025 (2010)). The petitioner here would have to show that if his current witnesses had testified at the sentencing phase, a reasonable probability exists that the sentence would have been different. *Moffett*, 156 So. 3d at 849 (citing *Spicer v. State*, 973 So. 2d 184, 191 (Miss. 2007)). Brown has not presented evidence that would have changed the result.

¶115. In the sentencing phase, the defense called two nurses who testified that Brown had

been very responsible and attentive in helping to care for his quadriplegic stepfather. They testified that Brown was dependable until he met Rachel Walker. The defense also called Brown's ex-girlfriend who testified that he was never violent toward her and that "he was nice to me." Brown then called his sister who testified that Brown had taken good care of her stepfather, that she got along well with Brown, and that her other two brothers had died. Finally, Brown insisted on testifying at the sentencing phase. He admitted that he had been with Walker on the night of the murder, but he denied any role in the killing. The defense also introduced a juvenile-court psychological report compiled in Louisiana when Brown was fifteen years old. That report recited some background family information about Brown. Finally, Brown attempted to call his mother to testify in mitigation. She had been subpoenaed and had been interviewed extensively. For unknown reasons, she chose not to appear at trial.

¶116. Before, defense counsel had sought and received a mental evaluation of Brown at the state hospital at Whitfield. Dr. Reb McMichael and Dr. Chris Lott had examined Brown for mitigation purposes. At the request of the defense, no reports were issued. Dr. Lott testified in the remand hearing after *Brown II* that he had examined Brown for mitigation purposes before the trial. He stated that his evaluation revealed some useful mitigation evidence but that certain negative information was likely to come out in cross-examination (such as Brown's prior convictions, his addiction issues, and his antisocial personality traits). Here, the attorneys weighed the risks and chose not to pursue testimony at the sentencing phase

42

from the state hospital experts. But an extensive mental evaluation had been performed before trial. The fact that the evaluation did not turn out to be useful does not lead to any conclusion that the attorneys failed to investigate.

¶117. Brown now submits affidavits from family members who testify about Brown's upbringing. Much of the information submitted by affidavit at this point was in fact discussed at the hearing required by *Brown II*. The effect of the death of Brown's father, his mother's killing of another man, Brown's car accidents, and the possible seizure disorder were discussed in Dr. Lott's testimony at that hearing. All of this could have been raised previously.

¶118. Additionally, some of the allegations here are contradicted by other testimony. Brown now claims that trial counsel "did not speak to [family members] about mitigation evidence at all." Ferrington testified that the defense had talked to family members. She testified that "we had contact on almost a daily basis with his mother. She was very involved in our preparation. And I believe his sister testified, also."

¶119. After a full review of the mitigation evidence submitted in the successive petition, we again conclude that Brown has not shown that his trial attorneys were ineffective in their presentation of mitigation evidence at the sentencing phase.

*XIII. Cumulative Error*

¶120. This Court reviewed the trial-court record for cumulative error in the direct appeal. None was found. This Court unanimously determined that

43

[a] review of the record evidences that the trial court conducted a remarkably clean and well-run trial. The trial court was careful to investigate all issues raised and properly rule upon each of them. No error, much less reversible error, was committed during the course of trial in the case sub judice. Therefore, there is no cumulative error and this issue is without merit.

*Brown I*, 682 So. 2d at 356.

¶121. Having fully reviewed the trial-court record at this stage and the submissions of post-conviction counsel, and after finding no significant error in any of Brown's claims, we decline to grant relief on any cumulative-error basis.

> XIV. *Post-conviction counsel was ineffective.*

¶122. This claim is not barred. Under this Court's decision in *Grayson v. State*, 118 So. 3d 118, 126 (Miss. 2013), death-penalty petitioners are entitled to effective assistance of counsel in post-conviction proceedings, and claims related to ineffective assistance of post-conviction counsel are not subject to the procedural bars.

¶123. In order to show ineffective assistance of post-conviction counsel, Brown has to meet the well-known *Strickland* test:

> The test for ineffective assistance of counsel is well-settled. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must first prove that his counsel was deficient, which requires showing that "counsel made errors so serious that [he or she was] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Secondly, a defendant must prove that the "deficient performance prejudiced the defense," which requires showing that "counsel's errors were so serious as to deprive the defendant of

44

a fair trial, a trial whose result is reliable." ***Id.*** Absent both showings, a defendant may not prevail on his claim that his counsel was ineffective. ***Id.***

This Court must "'strongly presume that counsel's conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy. In other words, defense counsel is presumed competent.'" ***Liddell v. State***, 7 So. 3d 217, 219–20 (Miss. 2009). And even where professional error is proven, this Court must determine if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ***Mohr v. State***, 584 So. 2d 426, 430 (Miss. 1991).

***Grayson***, 118 So. 3d at 126-27 (quoting ***Chamberlin***, 55 So. 3d at 1050).

¶124. Brown was represented at the initial post-conviction stage by James Craig. Craig is currently the director of the Louisiana office of the Roderick & Solange MacArthur Justice Center. He previously worked at the Mississippi Capital Defense Resource Center. At the time the petition was filed, Craig was one of the more experienced and respected capital-defense attorneys in Mississippi.

¶125. Craig filed a petition on behalf of Brown in March 1998. The petition raised seven issues. Craig's petition was successful initially. This Court granted the petition, in part, calling for a hearing on the question of ineffectiveness in the failure to secure expert testimony for the mitigation case. ***Brown II***, 749 So. 2d at 93.

¶126. Craig has submitted an affidavit in which he claims that his 1998 petition was "skeletal" and that he did not have sufficient time or resources to fully investigate and prepare a sufficient petition. He claims that he did not begin to work on Brown's petition until a month before it was due and that he did not have time to sufficiently investigate

45

relevant issues.

¶127.   Even if it is assumed that Craig's investigation and preparation of the first petition was deficient, Brown still has to show prejudice.   At this point, this Court must determine whether there is "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Chamberlin*, 55 So. 3d at 1050 (internal quotation marks omitted) (quoting *Mohr*, 584 So. 2d at 430).   A thorough review of all of the claims raised in the successive petition reveals none that have merit.   Thus, even if Craig had raised any or all of these claims, the result would have been the same.   Brown's ineffective-assistance-of-post-conviction-counsel claim therefore fails to meet the second *Strickland* prong.

> XV.   *Brown should be allowed to file motions for discovery and for expert access in the trial court.*

¶128.   Brown claims that he has been denied certain files by the State and that he should be allowed discovery into these matters.   Brown's discovery requests have been denied repeatedly by this Court.  A similar request was denied in December 2015 because the Court found that "there has been no minimal showing of any need for pre-petition discovery." Order,  *Brown v. State*, No. 2015-DR-01099-SCT (Miss. Dec. 23, 2015).

¶129.   Brown again sought discovery after the remand for a hearing in the first petition for post-conviction relief.  The trial judge denied discovery, and this Court affirmed on appeal. *Brown III*, 88 So. 3d at 731.  This Court held, "we cannot say that the trial court abused its

46

discretion in denying Brown's discovery request." *Id.*

¶130. Undeterred, Brown filed another motion for discovery. That motion was likewise denied. *Brown IV*, 255 So. 3d at 144. This Court held that "Rule 22(c) does not apply to successive petitions for post-conviction relief." *Id.* This Court further found that "Brown's filings before this Court and the State's response indicate that Brown has been given access to some of this information, while other information simply cannot be located and may not exist." *Id.* at 146 (footnote omitted). In its response to the petition, the State maintains that

> The State has made the district attorney's files open to Petitioner. The State has made the Natchez Police Department's files open to Petitioner. The State has made the Adams County Sheriff's Department's files open to Petitioner. The State has even taken time to help the Circuit Clerk of Adams County search for files that Petitioner claims are missing from his file.

¶131. We find that Brown's fourth request for discovery should be denied. This has been answered repeatedly.

## CONCLUSION

¶132. We conclude that Brown's successive petition for post-conviction relief should be denied. Most of the claims could and should have been brought well before now and are procedurally barred. The ineffective-assistance-of-counsel claim related to James Craig's representation in the first post-conviction petition is without merit.

¶133. **POST-CONVICTION RELIEF DENIED.**

**KITCHENS AND KING, P.JJ., BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. COLEMAN, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, C.J., AND MAXWELL, J.**

**COLEMAN, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶134. I concur with the majority's result. Because the instant case involves the application of the statute of limitations and other statutory bars to post-conviction relief, I write to again urge the Court to reexamine our holding in *Rowland v. State*, 42 So. 3d 503 (Miss. 2010), in which we held that certain fundamental-rights exceptions may be applied to avoid application of the post-conviction-relief statute of limitations and other statutory bars to relief.

¶135. For the reasons given in my concurring opinion in *Williams v. State*, 222 So. 3d 265, 268-71 (¶¶ 8-15) (Miss. 2017) (Coleman, J., concurring), I would overrule *Rowland* and any other case in which, and to the extent that, we have held that the fundamental-rights exception to the procedural bars can apply to the substantive bars codified by the Legislature in the Uniform Post-Conviction Collateral Relief Act.

**RANDOLPH, C.J., AND MAXWELL, J., JOIN THIS OPINION.**